## BOESS v. CLAUSEN & PRICE BREWING CO.

(Supreme Court, Appellate Division, First Department. December 22, 1896.)

1. MASTER AND SERVANT—FREIGHT ELEVATOR—SAFETY APPLIANCES.

A master fulfills his duty to employés by equipping a freight elevator, which they are required to use, with safety appliances which prevent a sudden fall only in case of the breaking of the cables, where such appliances are in common use, though other appliances exist which prevent a sudden fall in case of the breaking of the hoisting machinery as well as the cables.

2. SAME—DUTY TO INSPECT.

The failure of the master to inspect machinery for hoisting an elevator does not render him liable for injuries to an employé, caused by the falling of the elevator by reason of the breaking of a shaft, where the defect was a flaw in the center of the shaft, which had been produced by improper amalgamation, and which for some time had been gradually working outward, but had produced no indication from which, by careful inspection, its existence could have been discovered.

Appeal from trial term, New York county.

Action by Elizabeth Boess, as administratrix, against the Clausen & Price Brewing Company. From a judgment dismissing her complaint, plaintiff appeals. Affirmed.

This action was brought to recover damages under the statute for the death of plaintiff's intestate, alleged to have been caused by the negligence of the defendant corporation. The latter owned and operated a brewery at the corner of Fifty-Ninth street and Eleventh avenue in this city, and the plaintiff's intestate was in its employment at the time of the accident causing his death. His duties were, among other things, to operate a freight elevator in the defendants' brewery whenever it was necessary to carry bags of meal, malt, or hops from the first floor to the upper stories of the building. On the afternoon of July 24, 1894, a load of meal in bags was brought to the brewery, and five men, whose duty it was to do so, and of whom the plaintiff's intestate, Boess, was the captain or "boss," undertook to load this meal on the freight elevator, and carry it to the top floor of the brewery, and there unload and store it away. One or two loads of meal had been carried safely to the top floor, and on the next trip, just as Boess was about to stop the elevator at the top floor, the platform of the elevator, and the 25 bags of meal, and the 5 men who were on it at the time, fell suddenly to the basement of the building, and Boess was instantly killed. The cause of the falling of the elevator was the breaking off of the pinion of the driving shaft of the elevator engine at the point where said shaft entered the small gear wheel which operated the drum upon which were the cables which raised and lowered the elevator platform. This driving shaft was made of steel, and was about 2⅞ inches in diameter. The pinion at the end of the shaft which entered the small gear wheel which operated the drum was turned down to about 2⅝ inches in diameter, making a shoulder on the shaft of one-eighth of an inch, against which the small gear wheel was closely driven, and keyed on when hot. To use the language of the engineer whose duty it was to inspect the machinery: "If I liked to. put the wheel off, I must use a sledge hammer and warm it up, * * * and any machine shop would do that, but then the shaft is in bad condition. It is too much trouble. This pinion broke right at the shoulder of the shaft. I could not have examined this machine at that point

to see the shaft where it broke without taking the machine apart, and that would take,—I can't tell exactly,—anyhow two days to three days." This freight elevator was manufactured by the well-known firm of Otis Bros. & Co., of this city, but the exact time when it was put in is in some doubt; for, while it appears that a freight elevator was put in about 27 years before, it is not clear that it was the same elevator. It does appear, however, that the elevator had been extensively used, and that for at least four years it had been in defendants' brewery; that it sometimes needed repair; that the present was not the first accident; that the engineer never had the shaft out, never saw it out, never took off the gear wheel or saw it put on, and never took off the drum before the accident, and only inspected the engine, the key, the boxes, etc., and on the day of the accident did not look at the place where the pinion broke. One of the witnesses testified that he had personally known of two—both freight—elevators that fell by reason of the breaking of the pinion, and that for the purpose of safety in case of the breaking of the wheels or pinions elevators were made with an automatic safety on the drum of the engine, and also from the drum of the engine to the drum overhead, and that he had put up 100 elevators with that safety appliance; that it was intended "to operate in case of a break in the hoisting machinery"; that he had also seen put on four or five hundred freight elevators the overhead drum arrangements. It is conceded that neither of these safety appliances was used, and that there was no counterpoise or counterweight in the shaft of the elevator, which, to some extent, would have retarded the force of the fall. While this elevator did not have these additional contrivances, it was shown that it was equipped with such safety appliances as were in common use upon freight elevators at the time; that these consisted of two pairs of iron rods attached to the side of the elevator platform, and connected with a heavy spring over the top of the elevator, which spring was in turn connected with the lifting cables in such a way that, in case the cables broke, these springs would be released, and force these safety rods into ratchets on the running ways of the elevator, and prevent the elevator from falling, and at the same time shut the steam off from the engine. This safety appliance was designed to operate in the event of the breaking of the driving cables; but, in the event of the breaking of the shaft, as in this instance, the strain on the cables upon the spring would not be relieved, and it would not operate to prevent the fall of the elevator. Upon an examination of the shaft after the accident, and upon the question as to whether the fracture was a sudden break, or whether it was a gradual development of a flaw in the metal, the engineer, called by plaintiff, testified as follows: "From the appearance of this shaft, it has been going on some time. From an examination of that shaft, I cannot tell approximately how long a time. It was not an immediate fracture, however. * * * From the appearance of that fracture of that shaft, I can tell what was the condition of the shaft prior to the break. * * * 1 found a large flaw in the center, which still appears in the shaft,—right in the center, directly in the center of the shaft there is a large flaw. * * * The outside was perfect metal. The flaw extends to the outer circle. The flaw existed when the shaft was put in the machine,—what we call nonamalgamation of material; not perfectly amalgamated when first made. There does not appear, from my examination of the shaft, any flaw in the nature of a crack which existed in the shaft before the final break. If that shaft had been examined prior to the final break, no flaw or weakness would have appeared upon its surface. By looking at it, you could not detect the flaw on the inside. * * * In my opinion, when that shaft finally broke, it broke as the result of gradual weakening. In my opinion, that gradual weakening did not appear in any way that could have been detected by sight, not unless the machine was taken apart, and submitted to a practical examination. If practically tested, there would a flaw appear,—submitting it to a physical test; put in a testing machine, which would show if any flaw developed. In other words, testing its strength to see if there were any flaws." And upon cross-examination, when asked if, while the machine was in operation, and immediately prior to the accident, the shaft had been examined, whether any flaw would have appeared, he answered: "If submitted to a practical test, it would develop itself. If that shaft had been removed, and this gear

wheel taken off, immediately prior to that accident, a flaw would have appeared there to the naked eye, if submitted to a practical test; not otherwise, unless they had a powerful microscope, and examined for a slight crack; that might have disclosed it." Upon the elevator was the following notice: "Danger. Riding on elevator is strictly forbidden without permission." Upon this evidence the defendant moved to dismiss, on the ground that there was no evidence of defendant's negligence, and the plaintiff asked to go to the jury on that question, which latter motion was denied, and the former granted, dismissing the complaint; to both of which rulings exceptions were taken, and present the questions upon this appeal.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

W. W. Niles, for appellant.

Frank Johnson, for respondent.

O'BRIEN, J. The "danger" notice which was placed upon the elevator need not be considered, for the reason that it is admitted that Boess, the decedent, ran the elevator, and that he had a perfect right to be upon it. Nor need we trouble ourselves with the question of contributory negligence, because, upon the evidence, it cannot be said, as matter of law, that the decedent was negligent in allowing the other employés engaged with him in handling the meal to go up on the elevator, it appearing that that had been done frequently with the knowledge and consent of the officers and superintendent of the defendant corporation.

This leaves for consideration the main question on this appeal, viz. the defendant's negligence. This, it is urged, consisted in the failure to provide well-known safety devices; and, secondly, the failure to properly inspect the machinery and the shaft pinion. As to the former, the master is only bound to furnish such appliances as are in common use, and are reasonably safe. Here it is shown that the elevator was equipped with safety appliances such as were in common use upon freight elevators. This is not governed by the rules applicable to a common carrier of passengers. The liability of the defendant to answer for Boess' death must therefore be placed, if at all, upon the failure to properly inspect the machinery, shaft, and pinion. Upon that question the solution must be found in the answer to be furnished by the evidence as to whether the defendant failed in its duty to properly inspect, and whether such failure was the proximate cause of the accident. If the question rested solely upon inspection, then we think there was evidence in this case from which it could be inferred that the duty resting upon the defendant was not fully discharged; it appearing that for a long period—at least for four years—the shaft and pinion were not inspected, because, as stated by the engineer, to obtain an inspection it would have been necessary to take off the gear wheel; and this would be attended with so much trouble—it being necessary for that purpose to separate the shaft and pinion from the drum, and take out the key which held the gear wheel tight on the shaft or pinion, which would involve two or three days' work—that it was never attempted. If, from the evidence, however, it appears that, even though such inspection were had, it would not have disclosed the flaw in the shaft or pinion which caused the break, then

the failure to inspect cannot be regarded as the proximate cause of the injury. In other words, if it appears that, had the defendant inspected in accordance with its duty, and if upon such inspection the defect would not have been apparent or discoverable, then, clearly, inspecting would not have avoided the accident. As the evidence shows, the flaw was in the center, and was produced by an improper amalgamation of the metal, and was, therefore, inherent therein at the time when the elevator was constructed, and for some time it had been gradually growing from the center towards the surface, but had not, in the way of any crack or seam, produced any indication from which, by careful inspection, the existence of the flaw would have been discoverable. It cannot be held that the defendant was insurer against, or bound to know of, such inherent and undiscoverable defect. Having employed competent persons to construct the elevator, it had a right to assume that the duty which was placed upon them of furnishing proper and safe material had been discharged. There being, then, but one inference that can be logically adduced from the evidence, namely, that, had the defendant inspected the pinion and shaft within a reasonable time prior to the accident, it would not have discovered the flaw, it follows that the violation of the defendant's obligation to inspect was in no way related to or connected with the accident.

Our conclusion therefore is that the dismissal of the complaint was right, and that the judgment entered thereon must be affirmed, with costs. All concur.