Springer v. Ford.

## Warren Springer v. Samuel Ford.

1. PASSENGER ELEVATORS—*Degree of Care Necessary.*—Operators of passenger elevators should do all that human care, vigilance and foresight can reasonably do under the circumstances, and in view of the character of the mode of conveyance adopted, reasonably to guard against accidents and consequential injuries, and if they do not do so they are responsible for all consequences which flow from such neglect.

2. FREIGHT ELEVATORS—*Less Rigid Rule to be Applied.*—To freight elevators, a less rigid rule should be applied on account of the difference in the character of the conveyance. The weight of authority is that when the operator has supplied an elevator of approved kind and pattern, with machinery and appliances of a like nature, and has been reasonably prudent and careful in its operation and management, and has used reasonable and ordinary care in the inspection of the elevator, its machinery and appliances, he can not be said to be negligent in these respects and liable for injuries to persons riding thereon by reason of accidents occurring from a break in such machinery or appliances.

3. CARRIERS—*May Contract for Exemption from Liability for Ordinary Negligence.*—A carrier may contract for exemption from liability for ordinary negligence, but in order to relieve it from liability to its passengers there must be an express contract between it and the passengers.

**Action in Case,** for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in this court at the October term, 1899. Affirmed. Opinion filed May 10, 1900.

W. N. GEMMILL, attorney for appellant.

SETH F. CREWS and RALPH CREWS, attorneys for appellee.

MR. JUSTICE WINDES delivered the opinion of the court.

Appellee was injured July 7, 1895, by the falling of appellant's freight elevator, which was being operated for the use of his tenants generally, in an eight-story building on Canal street in Chicago, and brought suit to recover for his injuries. A trial in June, 1898, resulted in a verdict in appellee's favor for $5,000, but a new trial was granted. A second trial in April, 1899, resulted in a verdict for appellee of $7,500, upon which, after a remittitur of $2,500, the court rendered judgment for $5,000, from which this appeal is taken.

The declaration on which the trial was had, consists of six counts, the first of which as amended, in substance, charges generally that appellant wrongfully and negligently suffered said elevator and its attachments and appliances therewith connected to be and remain out of order and in an unsafe and dangerous condition, weak and insufficient,

and in that condition negligently operated it; the elevator rack broke and by reason thereof the elevator fell, causing the injury.   The second, third, fifth and sixth counts allege negligence in that the appellant allowed the elevator rack to remain in bad condition and so operated it, by means of which the accident was caused.   The fourth count charges the employment of an incompetent inspector of the elevator; that his incompetency was known to appellant and that on account of defective inspection by said servant the attachments used in the operation of said elevator were allowed to remain in a weak and unsafe condition, whereby it was caused to fall, and the plaintiff injured.   The plea was the general issue.

It appears from the evidence that for a number of years prior to the accident the Kinsella Glass Company, a corporation, which was the employer of appellee, had been a tenant of appellant and occupied the sixth floor of the building, which was then equipped with two elevators, one a passenger and the other a freight elevator, the latter of which caused the injury to appellee; that these elevators were operated by the servants of appellant for the benefit and use of all the tenants in the building, the freight elevator being used for the purpose of carrying freight up and down from one floor to another in the building, and that the glass company and its employes, as well as all the other tenants in the building, and their employes, used this elevator for the purpose of carrying freight of different kinds to and from the respective portions of the building occupied by such tenants; that it was customary during the whole time that appellee was employed by the glass company, which was from May 18, 1895, until the day he was injured, for any one having freight carried on this elevator, to go up or down, as the case might be, with the freight, to put the freight on the elevator and remove it, but it was not the custom for any one to ride upon the freight elevator unless he was taking freight thereon; that persons having occasion to go to the upper floors of the building or to descend therefrom, when not taking freight, rode on the passenger eleva-

tor; that appellee understood before he was injured that it was not proper for passengers to ride upon the freight elevator unless they had freight to take up or down, and he never rode on it except when taking freight, but instead used the passenger elevator, which was more convenient to the premises of his employer than the freight elevator for him, when not desiring to take freight up or down; that appellee's employment was in the shipping department of the glass company, and his duties required him to go up and down in the building from forty to sixty times per day, and in so doing he always rode upon the passenger elevator, except when he had freight of some kind to take up or down; that among his duties was that of taking sand, glass filings, scrap papers and sweepings up and down in the building; that about 10:30 in the morning that he was injured, he had collected some scrap paper and sweepings in a barrel, which he rolled from his employer's premises to a point near the elevator on the sixth floor, and called for the elevator, which came up from below, in response to his call, to the sixth floor, when he rolled the barrel onto the elevator and the operator shut the elevator door; that then the operator received another call from the top floor, to which he responded, and stopped the elevator at the eighth floor, when he walked toward the door on that floor to raise it. What then occurred is described by the plaintiff (he being the only witness in that regard) as follows:

"At that the elevator gave a jerk and he ran to it and pulled. I don't know whether he pulled up or down, but the elevator went to the ceiling and I do not remember any more. It fell. When I came to I was in the county hospital."

There is a great mass of evidence with regard to the condition of the elevator rack, the manner in which the elevator was operated, and in descriptions of the different parts of the elevator and the machinery and appliances used in its operation, as well as with reference to the inspection of the elevator and its appliances, and what was necessary and proper in that regard in order to make the use of a freight elevator ordinarily and reasonably safe for use under the

circumstances in question in this case.   The evidence shows that the principal and most important part of the machinery and appliances of this elevator was what is known as the elevator rack, it being so described in the declaration and by the witnesses in their testimony.   This rack consists of a piece of cast iron about three feet in length, about one and one-half inches wide and the same thickness, including the cogs, which extend almost from one end of the iron rack to the other on one side.   On the opposite side of this iron from the cogs is a slot extending along the center of the iron about eighteen inches in length, from about nine inches from one end to within about five inches of the other end, and of a depth of about five-sixteenths of an inch and three-fourths of an inch in width.   This rack is inclosed in a cast iron housing about twenty inches in length, in which the rack works back and forth as far as it is permitted by a set screw which passes through the housing near its lower end and into the slot of the rack, the upper end of the housing being fastened by leg screws to the ceiling of the basement floor near the engine which runs the elevator.   The lower end of the rack is connected by a rod with the steam valve of the engine, and the operator of the elevator, by pulling the cable up or down, as the case may be, moves the rack up or down, and thus causes the elevator to ascend or descend.   The cogs of the rack, as it passes up or down, fit into a small cog wheel which works on a pinion in the side of a housing about one foot below where the housing is fastened to the basement ceiling.   The purpose of the set screw is to hold the rack in place and to prevent its movement up or down further than the length of the slot, which is about eighteen inches, and is on the opposite side of the rack from the cogs.

On the trial there was used for purposes of illustration before the court and jury, and which was also offered in evidence attached to the bill of exceptions, made a part of the record in this cause and transmitted from the Circuit Court to this court, a complete rack and housing such as was used in the operation of the elevator at the time of the accident.   There was also offered in evidence, the same hav-

ing been identified and testified to by a number of the witnesses, a piece of the same rack which was being used in the operation of the elevator at the time of the accident, the breaking of which rack, it is incontestibly shown, was the cause of the falling of the elevator. This broken piece of rack is also attached to the bill of exceptions in this case. In order to obtain a full understanding of the questions of fact in this case, an examination of these exhibits is necessary. It is impossible to describe them so as to convey a complete understanding of the attachments, appliances and machinery of the elevator and its operation as the same appeared to the trial court and jury. From a careful examination of these exhibits in the light of the evidence in the record and the oral arguments of counsel, as well as their briefs, we have reached the conclusion that the liability of the appellant in this case depends upon two questions of fact, viz.: First, whether appellant was negligent in permitting the freight elevator to be operated in the condition in which this rack was shown to have been at the time of the accident; second, whether appellant was negligent in not having a sufficient and proper inspection made of the rack.

An examination of the broken piece of rack attached to the record, shows that at the end of the slot the rack 'had become hammered and worn down in a sloping or slanting direction to a depth of about 3-16 of an inch by the striking or wearing action of the stop-pin or set-screw upon the iron rack at the end of the slot. It is the theory of appellee's counsel, and apparently from the record this was the theory upon which the case was tried, that the set-screw had, by the operation of the elevator, become loosened and had worked out sufficiently previous to the time of the accident, to permit the end of the screw, when the rack, in the operation of the elevator, was pulled to a point which brought the screw to the end of the slot, to become wedged against the surface of the rack at a point past the end of the slot, and thus to cause, by the pressure of the screw on the rack, what is called in mechanics a beam or tranverse strain upon the rack, and that this caused the rack to break. This

strain, it is claimed, was caused by the pressure of the end of the screw on the rack, the small cog wheel resting upon the pinion in the side of the rack, the center of which is a little below the set-screw, forming the fulcrum. The play of the rack in the housing appears to be from 1-32 to 1-16 of an inch, probably not to exceed but very little, if any, 1-32 of an inch, and it is contended by appellant's counsel, that with such an amount of play of the rack in the housing it would be impossible to create a beam or transverse strain upon the rack in the manner contended.

It appears from the evidence of one witness, the engineer of appellant who ran the engine which operated the elevator, that he examined the screws about the engine and machinery of the elevator in the morning before the elevator was started, and found that they were not loose, and were in proper position. Another witness, one of the mechanics, who testified that he removed the broken rack from the housing shortly after the accident for the purpose of using it in making a new rack, said that he had to remove the set-screw in order to release the broken piece of rack and remove it from the housing. There is no testimony directly denying the evidence of these witnesses, but the fact remains and is not contested, that the breaking of the rack caused the elevator to fall. There is some evidence tending to show that where the rack was broken there was some indication of a flaw in the iron, but we think the clear preponderance of the proof shows that the iron rack at the point where it was broken showed a clean, fresh break, with no marked indication of any flaw or especial weakness in the rack at this point. The worn and battered condition of the rack at the end of the slot, which the evidence clearly shows was caused by the wearing or striking of the set-screw upon the end of the slot, plainly indicates that at some time preceding the accident the set-screw had so far worked out of its proper place that the end of it came very close to the surface of the rack, if not past the end of the slot, and we are of opinion that it was a question for the jury to determine from all the evidence, whether or

not in fact the set-screw at the time of the accident had become so far loosened or removed from its proper position as to become wedged or fastened upon the face of the rack beyond the end of the slot, or so near to the face of the rack and upon the slanting or battered portion of the rack at the end of the slot, and thus to form such a leverage upon the rack, with the small cog-wheel as the fulcrum, as to cause the breaking of the rack. We can not say from a careful consideration of the evidence bearing on this question, that a finding by the jury answering it in the affirmative, would be manifestly against the evidence. To discuss the evidence in detail would unnecessarily extend this opinion and serve no useful purpose.

As to whether there was a proper and reasonable inspection of the rack in question, was a question on which reasonable persons might well have differed, from the evidence on this record. There can be no question but that had the rack been removed from the housing, as the evidence shows might easily have been done in a very short space of time, by the loosening of the set-screw and withdrawing by hand the rack from the housing, the worn and battered condition of the rack at the end of the slot would have been apparent, and the liability to accident by reason thereof been disclosed to any person experienced in the operation of such machinery.

The evidence of witnesses of long experience in the operation of elevators, is to the effect, in substance, that it is usual and customary to inspect with care the different parts of elevator machinery daily. The evidence shows that the elevator rack is the all-important part of the machinery used in its operation, and it follows that reasonable and ordinary prudence on the part of persons operating an elevator would require an examination of the rack with care at reasonable intervals. The evidence of the city inspector of elevators is to the effect that he inspected this particular elevator and found that the rack, appliances and machinery connected therewith were in good order and condition on the 15th day of April, 1895, nearly three months

prior to the accident, and while he says he examined the set-screw or pin, he did not remove the housing or take the rack out to see what its condition was. He also says that the rack is the most important part of the operating machinery and should receive the most careful inspection; that it was proper to examine the housing and the rack to see that it was all right, and that the rack should not pass the stop-pin or set-screw. He certainly did not, on his own admission, make a reasonable or proper inspection of the rack. The only other testimony as to the inspection of the rack itself, is by the witness Stoetzel, who said that he had examined its condition before the break, but at what time he does not state, and that he knew of it being examined probably two weeks previous to the break, when he says he and a Mr. Merrill "then examined all the elevators all around," (referring to the elevators in this building), though he does not give a specific description as to the manner of the examination.

The engineer of appellant said that he examined the engines and machinery connected with the elevators in the building every morning, and saw that all the set-screws and keys were perfectly tight, would bring his torch and monkey-wrench and see that everything was in good shape; that he always did this before he started in the morning, and on the day of and before the accident he says, " I tried the set-screws and keys, the jamlets and locklets before I started," but does not say that he took out the rack or that it was exposed to his view in any way, though he said on cross-examination that if he wanted to examine the rack he would take it off, and that the rack could be taken out by slackening the set-screw, but that the easiest way to take the rack out was to take the face off the housing, which could be done in a very short time by unscrewing two bolts.

It is further shown by the evidence of several witnesses experienced in the operation of elevators, that such a thing as a rack breaking in the manner in which this rack was broken, they had never heard of.

After the most careful consideration of the evidence of

the witnesses on the question of inspection, the manner of the operation and the appliances of this elevator, and the appearance of the broken piece of rack attached to the record, we are of opinion that a finding by the jury that there was not a proper or reasonable inspection of the rack in question, and that by a reasonable inspection the dangerous condition of this rack by reason of its worn and battered condition at the end of the slot, and its liability to be broken, would have been revealed to a person of experience in such matters, and that the failure to make such inspection was negligence, and that such a finding is sustained by the evidence.

At the close of the plaintiff's evidence, and also at the close of all the evidence and before the arguments to the jury, appellant's counsel asked an instruction to the jury directing a verdict of not guilty, which the court refused. We think there was no error in that regard, and what has been said seems sufficient answer to the contention of appellant's counsel on this point.

It is claimed for appellant that when an owner of a freight elevator has provided an elevator with appliances that are in common use, and has exercised reasonable care in inspecting, repairing and managing the same, he has done all that the law requires. The evidence shows that this elevator was of a kind in common use, and that the appliances provided for its operation were also of a kind and character commonly used for freight elevators in the city of Chicago, and so far as these were concerned, there was no contention that there was any negligence on the part of appellant. The only negligence claimed, or on which there could be any recovery under the evidence in this case, is with regard to management and inspection. In this respect we are of opinion that as to freight elevators the rule is different from that of passenger elevators, which is that the operators " should do all that human care, vigilance and foresight can reasonably do under the circumstances, and in view of the character of the mode of conveyance adopted, reasonably to guard against accidents and consequent injuries, and if they do not do so they are responsible for all consequences which

Springer v. Ford.

flow from such neglect." Hartford Dep. Co. v. Sollitt, 172 Ill. 225; Field v. French, 80 Ill. App. 91, and cases there cited.

As to freight elevators, we are inclined to the view that a less rigid rule should be applied on account of the difference in the character of the conveyance, and that the weight of authority is that when the operator has supplied an elevator of approved kind and pattern, with machinery and appliances of a like nature, and has been reasonably prudent and careful in its operation and management, and has used reasonable and ordinary care in the inspection of the elevator, its machinery and appliances, then he can not be said to be negligent in these respects and liable for injuries to persons riding thereon by reason of accidents occurring from a break in such machinery or appliances. Hart v. Naumberg, 123 N. Y. 641; Kern v. Sugar Refg. Co., 125 N. Y. 50; Hall v. Murdock, 114 Mich. 233; Fairbank, etc., Co. v. Innes, 24 Ill. App. 35; Boes v. Brewery Co., 42 N. Y. Supp. 848; Strowbridge v. Bradford, 128 Pa. St. 200; Sack v. Dolese, 35 Ill. App. 636; affirmed in 137 Ill. 129; McGregor v. Reid, 178 Ill. 464; R. R. Co. v. Arnol, 144 Ill. 272; R. R. Co. v. Blumenthal, 160 Ill. 40–8.

In the Arnol case, *supra*, a woman riding on a railway freight train as a passenger, was allowed to recover for injuries received by reason of the negligent management of the train, and the court held that while passengers on such a train " can not expect or require the conveniences or all the safeguards against danger that they may demand upon trains devoted to passenger service," and must accept the accommodation subject to the " ordinary inconveniences, delays and hazards to such trains, when made up and equipped in the ordinary manner of making up and equipping such trains, and managed with proper care and skill," still the carrier must be " held to the same strict accountability for negligence of its servants injuriously affecting its passengers as it would be if the transportation had been by a train devoted to passenger service exclusively."

In the Blumenthal case, *supra*, this doctrine was re-

affirmed in the case of a drover riding on a railway freight train with cattle he was having shipped, he being injured by the negligent management of the train.

In the Sollitt and French cases, *supra*, which were cases of injuries on passenger elevators, the rule applicable to common carriers of passengers on railway trains was applied to operators of passenger elevators. We see no reason in principle why the same rule should not be applied to the operators of freight elevators who permit the carriage of passengers thereon, as is applied to railway freight trains that carry passengers; but in order to sustain the judgment in this case, it seems to us unnecessary that a more rigid rule should be applied than we have above stated.

Whether or not appellant was guilty of negligence in the management and inspection of this elevator in the respects hereinbefore referred to, was a question for the consideration of the jury, and the learned trial judge did not err in refusing a peremptory instruction to find a verdict of not guilty.

The lease of the glass company, appellee's employer, of the portion of appellant's building on the sixth floor occupied by it, had a provision to the effect that appellant should " not be liable for any damages occasioned by failure to keep said premises and elevators in repair." The lease was admitted in evidence on behalf of appellant, but the court instructed the jury in substance that as appellee was not a party to the lease he was not bound by any of its terms or conditions, unless the jury should believe from the evidence that appellee knew of the terms of the lease. It is contended that this was error, but no case is cited in support of the contention which is applicable to the facts of this case.

There is no evidence whatever that the appellee knew of he provisions of this lease, or that he contracted with his employer with reference to it, and there is no privity whatever between appellee and appellant. The cases cited by appellant are with reference to the liability of a tenant or landlord for injuries happening to employes or servants of

the tenant upon premises used, under the control of and occupied by the tenant.   Here there is no evidence that the tenant had anything whatever to do with the management or operation of the elevator, but the same was wholly under the control and supervision of appellant, who managed it for the use and benefit of all the tenants of the building. Appellee used the elevator, it is true, as an employe of the glass company, and because he was such employe, but without notice as to the terms of the lease.   It is true that a carrier may contract for exemption from liability for ordinary negligence (Arnold v. R. R. Co., 83 Ill. 273; Chicago, etc., R. R. Co. v. Chapman, 133 Ill. 96), but in order to relieve it from liability to its passenger there must be an express contract between it and the passenger (Arnold case, *supra*, and R. R. Co. v. Beggs, 85 Ill. 80), which is not true in the case at bar.

It is further claimed by appellant that appellee was a mere licensee, and therefore that appellant owed him no duty.   We think this contention is not tenable.   The evidence clearly shows that it was the custom at the time of the accident, and for a long time preceding it, for tenants having freight to take up or down on the freight elevator, which was provided by appellant for that purpose, to put the freight on the elevator, go with it, and remove it from the elevator.   The operator of the elevator was the employe and agent of appellant, and notice to him was notice to appellant, and the fact that employes of tenants were so allowed to go with the freight, in our opinion, charges the appellant at least with the duty of exercising ordinary, if not a higher degree of care, to prevent injury to such persons while riding on the elevator taking freight up or down. R. R. Co. v. Arnol, 144 Ill. 272; R. R. Co. v. Blumenthal, 160 Ill. 40.

The cases cited by appellant's counsel with reference to the assumption of risk by persons riding upon freight elevators, are cases where such elevators were used for freight only, and where they were used for the pleasure or convenience of the person injured, and not cases where the persons, by permission or invitation, impliedly or otherwise,

rode upon the elevator along with the freight carried, and for the purpose of assisting in placing the freight on or removing it from the elevator or doing it unassisted, as was the case with appellee.

Numerous other questions are presented by appellant's counsel, particularly with reference to the admission of evidence and in the giving and refusing of instructions, all of which we have carefully considered, and are of opinion that none of the rulings of the court in the respects complained of, present any reversible error.

The jury was fully and fairly instructed, and all the refused instructions were substantially covered by one or more given, or they were clearly improper for other reasons.

It is said that the damages are excessive, but we do not think that such is the fact. Two juries have passed upon the question of damages, the first giving a verdict of $5,000 and the second $7,500, and from the latter verdict there has been a remittitur of $2,500. The latter trial, so far as appears from the evidence and proceedings of the court was fair, and the jury fully and fairly instructed. The plaintiff testified : " My right leg was smashed across the instep and the left leg was broken at the shin bone, and the bone was fractured, and both of the bones came right clean through the flesh and all—stuck outside of the leg;" also that he was scratched and bruised; had pains through his stomach while he was in the hospital; that after a lapse of some ten weeks he had to undergo a second operation; that his leg had to be broken over again and the bones wired together; that he had to stay in the hospital some eighteen weeks; that the wires had to be taken out of his leg and the bones scraped, and the leg had to remain in plaster about eight or nine months, and that he started to walk without crutches about a year and two months after the accident. It was agreed on the trial that appellant would take the plaintiff's statement as to the extent of his injuries, and that the plaintiff would omit the calling of a doctor. No contest appears to have been made as to the extent of the injuries. We think the verdict as to amount should not be disturbed, and the judgment is therefore affirmed.